1
2
3
4            **UNITED STATES DISTRICT COURT**
5                 **DISTRICT OF NEVADA**
6
7  UNITED STATES OF AMERICA,              )
8                          Plaintiff,     )     Case No. 2:07-cr-00235-RCJ-PAL
                                          )
9  vs.                                    )          **REPORT OF**
                                          )
10 HECTOR GARCIA,                         )   **FINDINGS AND RECOMMENDATION**
                                          )
11                       Defendant.       )        (M/Suppress - #12)
   _____    )
12

13       This matter was referred to the undersigned for findings and recommendations pursuant to

14 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 on defendant's Motion to Suppress (#12) filed January 3,

15 2008.  The court has considered the motion, the United States' Response (#13) to defendant's motion to

16 suppress, Garcia's Reply (#14), and the testimony adduced at an evidentiary hearing conducted

17 March 11, 2008.  For the reasons set forth below, it is my recommendation that the defendant's motion

18 to suppress be denied.

19                                  **BACKGROUND**

20       The defendant Hector Garcia ("Garcia") is charged by way of an indictment returned

21 September 26, 2007 with coercion and enticement in violation of 18 U.S.C. § 2422(b).  The indictment

22 alleges that Garcia knowingly attempted to persuade, induce, or entice an individual under the age of

23 eighteen to engage in sexual activity.  According to the discovery Garcia has been provided, he came

24 under an investigation as a result of internet contact with an individual identifying herself as "Emily"

25 who turned out to be a Las Vegas Metropolitan Police Department ("LVMPD") Detective.  The

26 government alleges that after engaging in several internet conversations with "Emily," Garcia arranged

27 to meet her at a local park.  Garcia was under surveillance and observed entering, driving through and

28 eventually parking in the park where the meeting was to take place and taken into custody.  He was

1  placed in the back of the Detective's vehicle and questioned.  In the current motion, Garcia seeks to

2  suppress incriminating statements made, asserting they were obtained in violation of his Fifth

3  Amendment rights.  Specifically, Garcia asserts that he was subjected to custodial interrogation prior to

4  administration of *Miranda* warnings.

5        The government's response to the motion to suppress acknowledges that Garcia was in custody

6  and placed in the back of an unmarked detective vehicle at the time he made incriminating statements

7  prior to the administration of *Miranda* warnings.  However, the government disputes that the

8  incriminating statements Garcia seeks to suppress were made in response to questioning initiated by a

9  law enforcement officer.  The government argues Garcia made spontaneous voluntary statements to

10  Detective Moniot prior to the administration of *Miranda* warnings, and thereafter was appropriately

11  advised of and waived his *Miranda* warnings in a written consent form.

12        Garcia replies that the follow-up investigation/police report clearly reflects that after he was

13  taken into custody, the detective escorted him to an unmarked detective vehicle and initiated a dialog

14  with him.  Under these circumstances, Garcia argues he was clearly in custody, and that *Miranda*

15  warnings were required before the detective initiated questioning.  Garcia maintains that he made

16  incriminating statements in response to interrogation which was conducted prior to the administration

17  of *Miranda* warnings, and that his statements should, therefore, be suppressed.

18        The parties supported their moving and responsive papers with excerpts from the police reports

19  from which different reasonable inferences could be drawn.  The court, therefore, set the matter for an

20  evidentiary hearing to determine the parties' conflicting claims concerning whether Garcia was

21  subjected to custodial interrogation prior to the administration of *Miranda* warnings, whether Garcia

22  waived his rights under *Miranda*, and whether his statements were voluntary.  At the evidentiary

23  hearing, the government called Detective Tim Moniot and rested.  Garcia testified on his behalf.

24  **Testimony of Detective Tim Moniot**

25        Detective Moniot has been employed with the LVMPD for more than fourteen years and has

26  been a detective for ten years.  For the past five years, he has been assigned to a joint LVMPD/FBI

27  Internet Crimes Against Children Task Force which investigates crimes involving the sexual

28  exploitation of children as it relates to the internet, the manufacture and distribution of child

2

1   pornography, and luring and enticing children over the internet for purposes of sex.  He has received

2   specialized training in this area from the FBI Innocent Images National Initiative and completed that

3   certified course to conduct online investigations.  He is a certified computer forensic investigator and

4   has taken numerous other seminars and courses in this area.

5           He was on duty on September 20, 2007 and came in contact with the defendant, Hector Garcia,

6   whom he identified in open court.  Moniot and others were conducting an undercover investigation

7   concerning luring and enticing a minor based on internet conversations he initiated in his undercover

8   role as a thirteen-year-old girl named Emily.  Beginning in November 2006, Moniot conducted an

9   undercover internet investigation in the persona of a thirteen-year-old girl named Emily.  "Emily" was

10  contacted by an individual using the screen name "LVBicock," later identified as the defendant, Hector

11  Garcia.  The online conversations between Emily and Garcia discussed having intercourse and oral sex.

12  During their first online chat, Moniot said Emily was thirteen years old and built into the online

13  conversation the persona and life of a thirteen-year-old girl.  Emily said she lived with her grandmother

14  and chatted about school, homework, and other characteristics of what thirteen-year-old girls would do.

15  At one point, Garcia talked [chatted online] about how he could get in trouble for being with a thirteen-

16  year-old girl.

17          On September 20, 2007, Garcia set up a meeting with Emily.  Moniot and other undercover

18  officers were at the park where the meeting was arranged.  Officers saw Garcia's vehicle driving

19  through the park.  He made two or three passes through the park, looking around and parked next to an

20  FBI agent's undercover car.  He left that spot and eventually parked in front of the park area where

21  Emily and Garcia arranged to meet in the area closest to the slides.  Garcia was arrested, handcuffed,

22  and not free to leave.  Moniot was the primary case agent and introduced himself, told Garcia to relax,

23  and said he wanted to speak with Garcia.  Moniot explained to Garcia what the officers were doing in

24  the park and asked if Garcia would be willing to talk with Moniot privately in his car.  Garcia agreed.

25  Moniot knew that Garcia was in the military and was a "good-sized guy."  Moniot told Garcia that if he

26  would agree to be non-combative and cooperative, Moniot would place his handcuffs in front to make

27  him feel more comfortable.  Moniot felt he could extend this courtesy because there were a number of

28  other law enforcement officers present in the park.  Garcia agreed he wanted to talk and that he would

3

1   not become combative.  Moniot walked Garcia to the front bumper area of his undercover vehicle near

2   where Garcia was initially taken into custody and placed his handcuffs in front of him.  While another

3   officer stood by, Moniot walked around and got into the car.  Garcia got into the passenger side.

4        Moniot and Garcia were the only persons in the car.  Moniot told Garcia that he wanted to talk

5   and get Garcia's side of the story and find out why he was there.  However, he first needed to gather his

6   paperwork and get his recorder and the forms he intended to provide Garcia before initiating

7   questioning.  Up until this point, Moniot had not asked Garcia any questions except to obtain his name,

8   address, where he worked, and other identification information.  Moniot filled out paperwork in the

9   vehicle while asking these identification-type questions.  Garcia was seated next to Moniot with his

10   hands in a praying-type gesture with his fingers pointed up over his nose, rocking back and forth, and

11   made three statements that Moniot overheard:  "I can't believe this is happening," "Oh my God, what

12   did I do?" and "That girl is under age."  At the time Garcia made these statements, Moniot was not

13   engaged in conversation, and Garcia was looking straight forward, talking to himself.  Garcia said some

14   other things that Moniot could not quite make out.  Moniot looked at Garcia who was wide-eyed and

15   Garcia said, "That girl was under age."  Moniot responded, "Yeah."  At this point, Moniot had finished

16   filling out the advisement of rights form and indicated that he wanted to go over the rights before the

17   taped interview.  Moniot told Garcia everything was going to be okay and to relax and that he wanted to

18   get Garcia's side of the story.  Moniot tried to keep Garcia calm and did not want him worked up

19   because Garcia was handcuffed in front, and Moniot did not want a confrontation.

20        Moniot had the advisement of rights form and read them to Garcia, although his recollection

21   was that knowing he was going to have Garcia read the form, he went over them superficially.  Moniot

22   told Garcia he would have an opportunity to read the form and confirmed Garcia could read and write

23   English.  He then went over the rights "superficially" and handed Garcia the paper so that Garcia could

24   read his rights.  When asked to explain what he meant by going over the rights "superficially," Moniot

25   explained that there are some differences between the wording of the federal and state advisement of

26   rights forms, and that the federal form is more "wordy," so he did not read it verbatim.  However,

27   Moniot explained that Garcia had the right to remain silent and that anything he said could be used

28   against him in a court of law, that he had the right to an attorney, and that if could not afford one, one

4

1    would be appointed.  Moniot then handed Garcia the form and told him to read it and to sign it if he

2    understood and agreed.  Garcia stated he understood his rights and signed the form.  The advisement of

3    rights form Garcia signed was marked and admitted as Government's Exhibit "1."

4          After Garcia signed the form and agreed to talk, Moniot initiated questioning about the facts of

5    the case for the first time.  He tape recorded the interview with Garcia, and Garcia acknowledged on the

6    tape that he had waived his rights.  Garcia admitted that he was at the park to meet an underage girl, and

7    that his screen name was "LVBicock," but was supposed to be "LVBigCock."  Garcia admitted to

8    chatting with Emily and that he was there to meet her for sexual purposes although he was not sure they

9    were going to "go all the way."  Garcia admitted he had purchased condoms before coming to the park

10   and police recovered condoms from his car.

11         On cross examination, Moniot testified he was the arresting officer.  When he first made contact

12   with Garcia, he had his gun drawn.  Two other officers were on the scene and had their guns drawn, FBI

13   Supervisor Eric Vandersteldt, and another FBI unit, possibly Nick Bugni, who parked behind and

14   blocked Garcia's vehicle.  Vandersteldt and Bugni initiated the contact with Garcia, pulled their guns,

15   and told Garcia to get out of his vehicle.  Moniot pulled behind their undercover vehicles, and Garcia

16   was outside when Moniot first approached.  Moniot initially cuffed Garcia behind his back.  As Moniot

17   and Garcia approached Moniot's undercover vehicle, Moniot told Garcia that he would cuff him in

18   front if Garcia agreed not to act up and get combative.  Garcia agreed and was handcuffed in front.

19         When Garcia sat in Moniot's car, he was rocking back and forth and holding his hands as if

20   praying.  He seemed nervous and apprehensive and was probably scared.  Moniot put Garcia in the

21   passenger side and walked around and got into the driver's side.  He retrieved his paperwork from a

22   briefcase or satchel in the vehicle.  While retrieving his paperwork, Moniot may have made statements

23   trying to keep Garcia calm and develop rapport with him, which is how he generally handles

24   interrogations.  He was engaging in small talk with Garcia, but not asking him any questions about the

25   case.

26         Moniot verbally advised Garcia of his *Miranda* rights.  Moniot clarified what he meant when he

27   testified on direct examination that he "superficially advised" Garcia of his rights.  Moniot had the form

28   in his hand and as a detective knew the rights by heart.  He verbally advised Garcia of his *Miranda*

1  rights in layman's terms, glancing at the form and told Garcia that the form would be provided to him.

2  "Superficially" may not have been the correct word to use.  He meant that he did not read from the form

3  verbatim.

4        The transcribed version of the tape recorded interview of Garcia by Detective Moniot was

5  marked and admitted as Defendant's Exhibit "A."  Detective Moniot's Officer's Report was marked

6  and admitted as Exhibit "B."  Moniot's Officer's Report does not indicate that he verbally advised

7  Garcia of his rights.  The report reflects that Garcia was provided with his federal advice of rights form

8  and signed it.  The report also reflects Garcia signed a consent to search form for his vehicle.

9        Moniot and the two officers initiating contact with Garcia had their guns drawn while they were

10  securing him.  The time on the advice of rights form is 10:15 a.m.  The voluntary statement marked as

11  Exhibit "A" indicates the interview began at 10:19 a.m.  In the four-minute interval between the time

12  the form was signed and the interview began, Moniot engaged in small talk, trying to keep Garcia calm,

13  and obtain biographical information from him.  Page 2 of the voluntary statement marked as

14  Exhibit "A" contains Moniot's statement to Garcia that he and Garcia spoke for a few minutes off the

15  tape recorder, and a reference to what occurred before the recording began.  Moniot asked Garcia in the

16  recorded statement whether he agreed he had been provided with an advisement of rights form and that

17  he had waived his rights and signed the form and agreed to speak.  Garcia answered yes.  However,

18  Moniot did not readvise Garcia of his *Miranda* rights on tape.  The tape recorded statement transcribed

19  and admitted as Defendant's Exhibit "A" ended at approximately 11:00 a.m.  There were a few

20  additional points Moniot wanted to discuss with Garcia, and he started a second tape recorded interview

21  two minutes later at 11:02 a.m. which ended at 11:11 a.m.  The transcription of the second tape

22  recorded interview was marked and admitted as Defendant's Exhibit "C."  On Page 8 of 9 of the

23  transcribed statement, Garcia asked "did I waive my right for a lawyer seriously?"  Moniot asked Garcia

24  if he wanted to stop talking.  Garcia responded "I am going to be in trouble anyway."  Moniot again

25  asked Garcia if he wanted to stop talking.  Garcia responded affirmatively.  Moniot asked him to say it

26  audibly for the tape recorder.  Garcia indicated he wanted to stop talking, and Moniot terminated the

27  interview.

28  / / /

**Testimony of Hector Garcia**

Mr. Garcia recognized Detective Moniot as the officer who arrested him and placed him in handcuffs. He was arrested at gunpoint after parking a short time at the Rafael Rivera Park. He was scared at the time of his arrest. Approximately two to three minutes elapsed between the time Detective Moniot first approached him, and he was placed inside Detective Moniot's vehicle. Garcia did not make any small talk with Detective Moniot from the point of the arrest until being placed in the vehicle. Detective Moniot did, however, say he wanted to speak with Garcia in private and get Garcia's side of the story. "It went from handcuffs to I want to get your side of the story, I want you to be honest." Detective Moniot did not threaten Garcia and was being very friendly. Before placing Garcia in the passenger side of the vehicle, Moniot mentioned that he would place the handcuffs in front "being I agreed to talk to him." Detective Moniot handcuffed him in front and had him get into the passenger side and then walked around to get into the driver's side of the vehicle. Detective Moniot said "I know what's going on" and "I want to get your side of the story" and "I want you to be honest."

Moniot asked if there was anything in the vehicle, specifically, any weapons. Garcia was shocked and told Moniot there were no weapons in his vehicle. While the detective was getting situated, he was very friendly and informal. Garcia testified he was shocked, scared, thinking of his wife, what was happening to him, and trying to find words to pray. He did not know any. He recalled saying "Oh my God, oh my God, what did I do." He was rocking back and forth. He recognized Government's Exhibit "1," the advice of rights form. Moniot did not read Garcia his rights before Garcia signed the form. Moniot did not verbally inform Garcia of his rights. Garcia signed the advice of rights form but did not read each and every right on the form before signing it because he was shocked and scared. He recalled thinking that he should read the form, and make sure what he was signing. However, he was too shocked and scared, and Moniot stated "this says you agree to talk to me, and you did agree, right?" Garcia agreed and signed. Garcia understood that before he could talk to Detective Moniot, he had to sign the form. Garcia also signed a consent to search form. He believed he signed the consent to search form before the advice of rights form. Both were signed "close in time, and quick in time."

///

1      Garcia has read Exhibit "A," and it is an accurate transcription of his interview with Detective

2  Moniot.  Garcia testified that when he started the conversation with Detective Moniot at 10:19 a.m., he

3  was not aware that he had waived his right to a lawyer.  He was not aware that he had waived his right

4  to remain silent, or that anything he told Detective Moniot could be used against him in a court of law.

5  Garcia did not realize that he had the right to have a lawyer present during questioning or that if he

6  decided he did not want to continue talking, he could stop at any time.  Defendant's Exhibit "C" is

7  another transcript of his interview with Detective Moniot.  Garcia has reviewed the statement, and it is

8  accurate.  On Page 8 of Exhibit "C," Garcia asked "did I waive my right to a lawyer seriously?" and

9  then indicated he wanted to stop talking.  This was the first time Garcia realized he had waived his right

10  to talk with Detective Moniot with a lawyer.

11      On cross examination, Garcia testified that Detective Moniot did not ask him any questions

12  about the case until after he signed the advice of rights form.  In the statement, Detective Moniot asked

13  Garcia if he understood his rights, and Garcia answered yes.  Garcia has received basic training and

14  leadership training in the military, and his rank is staff sergeant.  He has been in the military for nine

15  years.  The military teaches him to deal with stressful situations.  Detective Moniot did not tell Garcia

16  to read the advice of rights form.  He said "this is the form you need to sign to talk to me."  Garcia

17  knew that if he did not sign the form, Moniot would not ask him questions, and Garcia wanted to talk to

18  Moniot.  Garcia reached over and signed the form without reading it.  He does not make a habit of

19  signing forms without reading them.

20      While seated in the vehicle, Garcia made statements to the effect of "oh my God" and "what did

21  I do" while rocking back and forth.  These statements were not made in response to any questions from

22  Detective Moniot.  As soon as Detective Moniot understood that Garcia wanted to stop questioning,

23  Moniot stopped the questioning.  Before Detective Moniot understood what Garcia was saying, he

24  asked questions to find out what Garcia meant.  Detective Moniot did not ever ask if Garcia would talk

25  to him.  Moniot told Garcia he wanted Garcia to talk with him.  However, Garcia reiterated that he

26  knew that if he did not sign the paper, he could not talk to Detective Moniot, and that he wanted to talk

27  to Moniot.

28  / / /

1    The court inquired of Mr. Garcia what caused him to ask the question "did I waive my right

2  to a lawyer seriously?"  He first responded that he was "relaxed."  Garcia heard what Moniot repeated

3  about "*Miranda*" or "rights," and that is when it "hit him in the head" like "Law and Order," and he

4  remembered that when someone gets arrested, they get told their rights.  He was confused and that

5  is when it hit him that "maybe this is it."  Between the two tape recorded interviews contained in

6  Exhibit "A" and Exhibit "C," Garcia asked the detective if he was going to jail, and the detective told

7  him yes.  "From then on, I woke up from the fright that I had," and decided that he needed a lawyer.

8  Moniot initially did not understand, Garcia rephrased, and from then on Garcia realized he needed

9  to start thinking about the law, what was required, and "what my right was."  Until then, "I was

10  somewhere else."

## DISCUSSION

12    The Government has the burden of proving, by a preponderance of the evidence, whether a

13  confession is voluntary.  <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972).  The Government must also

14  establish, by a preponderance of the evidence, that a defendant waived his protection against self

15  incrimination under *Miranda*.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986).  Garcia does not claim

16  that any of his statements were involuntary.  Rather, his written motion asserts he was subjected to

17  custodial interrogation prior to the administration of the *Miranda* warnings, and that his statements

18  must, therefore, be suppressed.  Additionally, in oral argument following the evidentiary hearing,

19  counsel for Garcia argued that Garcia's tape-recorded statements must be suppressed because Moniot

20  did not adequately advise Garcia of this *Miranda* rights, and Garcia did not voluntarily waive his rights.

21    **A.    The Requirement for *Miranda* Warnings**

22    *Miranda* warnings are necessary when a suspect in custody is interrogated by police.

23  <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995).  Custodial interrogation is questioning initiated

24  by law enforcement officers after a person has been taken into custody or deprived of his freedom.

25  <u>United States v. Butler</u>, 249 F.3d 1094, 1098 (9th Cir. 2001), <u>citing</u>, <u>Miranda v. Arizona</u>, 384 U.S. 436,

26  444 (1966).  In determining whether a suspect was in custody, "the ultimate inquiry is simply whether

27  there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal

28  / / /

9

1   arrest." <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994), <u>quoting</u>, <u>California v. Beheler</u>, 463 U.S.

2   1121, 1125 (1983).

3          The determination of whether a defendant is in custody for purposes of the requirement to

4   provide *Miranda* warnings is made by examining the objective circumstances of the interrogation.

5   <u>Stansbury</u>, 511 U.S. at 323.  Because courts are directed to examine the objective circumstances of

6   the interrogation, the subjective views of the suspect or the interrogating officer are not relevant to the

7   determination of whether the defendant was in custody.  <u>Id</u>.  <u>See also</u> <u>United States v. Leasure</u>,

8   122 F.3d 837, 840 (9th Cir. 1997).  In the Ninth Circuit the issue of whether a defendant was subjected

9   to custodial interrogation is a mixed question of law and fact which is reviewed by the Circuit Court of

10  Appeals *de novo*.  <u>United States v. Moreno-Flores</u>, 33 F.3d 1164, 1168 (9th Cir. 1994); <u>United States v.</u>

11  <u>Foster</u>, 227 F.3d 1096, 1102 (9th Cir. 2000).  It is undisputed that Garcia was taken into police custody

12  and under formal arrest from the point of his initial contact with law enforcement officers at the park.

13  *Miranda* warnings were, therefore, required before a law enforcement officer could initiate custodial

14  interrogation.

15         **B.     Garcia's Pre-*Miranda* Warning Statements**

16         Garcia's written motion to suppress asserts he was subjected to custodial interrogation prior

17  to the administration of *Miranda* warnings.  It is undisputed that Garcia was immediately taken into

18  custody upon his initial contact with law enforcement officers at the park, and that he was not

19  administered *Miranda* warnings until after he was placed in Detective Moniot's undercover vehicle.

20  It is also undisputed that Moniot and Garcia engaged in conversation before *Miranda* warnings were

21  administered.  Moniot testified that he did not ask Garcia any questions about the case, but did ask

22  identification or biographical-type questions to identify Garcia and his vehicle before *Miranda*

23  warnings were administered.  Garcia also testified that Moniot did not ask him any questions about the

24  case until after he signed the advice of rights form.

25         The Supreme Court and the Courts of Appeals have repeatedly emphasized that many types of

26  questions are not considered interrogation and do not require *Miranda* warnings.  For example, "routine

27  booking" questions reasonably related to police record keeping concerns do not require *Miranda*

28  warnings because they are not designed to elicit incriminating responses.  <u>Pennsylvania v. Muniz</u>,

10

1    496 U.S. 582, 600-02 (1990) (plurality opinion).  Similarly, asking a suspect questions regarding

2    general biographical information is not interrogation.  United States v. Foster, 227 F.3d at 1103 (9th

3    Cir. 2000).  Courts "generally do not view inquiries regarding general biographical information as

4    'interrogation.'" Foster, Id., citing Pennsylvania v. Muniz, 496 U.S. 582.  United States v. Booth, 669

5    F.2d 1231, 1238 (9th Cir. 1981) ("Ordinarily, the routine gathering of background biographical data

6    will not constitute interrogation.").  The Ninth Circuit uses an objective test to determine whether

7    questioning constitutes interrogation.  Moreno-Flores, 33 F.3d at 1169.

8         In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court defined interrogation as

9    "express questioning or its functional equivalent."  Id. at 300-01.  The Ninth Circuit has observed

10   "[t]he standard for determining whether an officer's comments or actions constitute the 'functional

11   equivalent' of interrogation is quite high . . . ."  Foster, 227 F.3d at 1103, citing, Innis, 446 U.S. at

12   301-02.  Statements by police officers "normally attendant to arrest and custody" do not constitute

13   interrogation for purposes of the necessity to administer *Miranda* warnings.  Innis, 446 U.S. at 301.

14   Declaratory statements by police officers about the nature of the charges and evidence against a suspect

15   are not the functional equivalent of interrogation.  Moreno-Flores, 33 F.3d at 1169, citing United States

16   v. Payne, 954 F.2d 199, 202 (4th Cir.), cert. denied, 503 U.S. 989 (1992).  See also, Shedelbower v.

17   Estelle, 885 F.2d 570, 573 (9th Cir. 1989), cert. denied, 498 U.S. 1092 (1991) (holding statements to a

18   suspect that his accomplice had been arrested and untruthful statement that victim had identified him

19   did not constitute the functional equivalent of interrogation).

20        The Ninth Circuit has recognized "that when an officer informs a defendant of circumstances

21   which contribute to an intelligent exercise of his judgment, this information may be considered

22   normally attendant to arrest and custody."  United States v. Crisco, 725 F.2d 1228, 1232 (9th Cir.

23   1984), cert. denied, 466 U.S. 997.  Moreover, the fact that an officer's statements "may have struck a

24   responsive chord" or may have constituted "subtle compulsion" is not enough to establish the

25   functional equivalent of interrogation.  Moreno-Flores, 33 F.3d at 1169-70, citing Innis, 446 U.S. at

26   303.

27        The facts of the Supreme Court's decision in Innis are instructive.  Innis was arrested for

28   robbery.  While being transported to the police station, officers discussed the possibility that nearby

11

1   handicapped children might find a shotgun used in the robbery and harm themselves.  Innis, 446 U.S. at

2   294-95.  In response, Innis asked the officers to turn the car around so he could lead them to the

3   shotgun.  Id.  The Supreme Court found that two officers' conversation in the presence of the defendant

4   did not constitute an interrogation in violation of *Miranda*.  The court reasoned that, even if there was

5   "subtle compulsion" at work in the police car, it did not amount to interrogation unless the officers had

6   reason to know that their comments or actions were "reasonably likely to elicit an incriminating

7   response."  Id. at 303.

8        Detective Moniot's testimony was uncontroverted, that prior to the administration of *Miranda*

9   warnings, he asked Garcia only biographical or identification-type questions.  Garcia testified that he

10  was not asked any questions about this case before he signed the advisement of rights form.  He also

11  testified that he made statements to the effect of "Oh my God, what did I do?" while rocking back and

12  forth in the passenger's seat of Moniot's vehicle when he was "shocked and scared" and thinking of

13  words to pray.  Most importantly, he testified on cross examination that these statements were not made

14  in response to any police questioning.

15      Both Moniot and Garcia testified that as Moniot was getting his paperwork and recorder ready

16  to conduct an interview, Garcia was rocking back and forth with his hands in a praying position in the

17  passenger seat of Moniot's vehicle, making statements.  Moniot recalled that Garcia said "I can't

18  believe this is happening," "Oh my God, what did I do?" and "That girl is underage."  Garcia testified

19  that he recalled saying "Oh my God, Oh my God, what did I do?" while rocking back and forth with his

20  hands in a praying position.  The only difference in their testimony was that Moniot recalled Garcia

21  making three statements rather than one.  The court finds the inculpatory statements Garcia made in

22  Moniot's undercover vehicle prior to the administration of *Miranda* warnings were not the result of

23  express police questioning or its functional equivalent.  The only questions Moniot asked were general

24  biographical or identification-type questions for which *Miranda* warnings were not required.

25  Suppression of Garcia's pre-*Miranda* statements is, therefore, not required.

26      **C.   Garcia's Post-*Miranda* Statements**

27      Miranda v. Arizona held that before the prosecution can admit a defendant's incriminating

28  statement, it must prove that the accused waived his or her right against self incrimination.  The

1  *Miranda* decision created the requirement to administer *Miranda* warnings which are so well known,

2  that they "have become part of the national culture." <u>Dickerson v. United States</u>, 530 U.S. 428, 443

3  (2000).  Before introducing a defendant's incriminating statements into evidence, the government has a

4  heavy burden to prove that he voluntarily, knowingly, and intelligently waived his *Miranda* rights.

5  <u>Miranda</u>, 384 U.S. at 444.  Although the government must prove, by a preponderance of the evidence,

6  that a defendant waived his *Miranda* rights, an express waiver is not necessary.  <u>North Carolina v.</u>

7  <u>Butler</u>, 441 U.S. 369, 373, 375-76 (1979).  Rather, a valid waiver of rights may be implied under the

8  circumstances.  <u>United States v. Rodriguez</u>, ___ F.3d ___, 2008 WL 623982, *6 (9th Cir. 2008).  For

9  instance, "a suspect may impliedly waive the rights by answering an officer's questions after receiving

10  Miranda warnings.  A suspect who blurts out a confession after receiving and understanding a Miranda

11  warning has unambiguously waived his rights, albeit impliedly."  <u>Id.</u> (internal quotations omitted).

12       A totality of the circumstances test is applied to determine whether a waiver was voluntary,

13  knowing, and intelligent.  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  The court examines the

14  circumstances surrounding the interrogation.  Factors commonly considered include the defendant's

15  intelligence and education, <u>United States v. Bautista-Avila</u>, 6 F.3d 1360, 1365-66 (9th Cir. 1993), age,

16  <u>United States v. Doe</u>, 155 F.3d 1070, 1074-75 (9th Cir. 1998) (<u>en banc</u>), familiarity with the criminal

17  justice system, <u>United States v. Williams</u>, 291 F.3d 1180, 1190 (9th Cir. 2002), <u>overruled on other</u>

18  <u>grounds</u>, <u>United States v. Gonzales</u>, 506 F.3d 940 (9th Cir. 2007), physical and mental condition,

19  <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1080-81 (9th Cir. 2000), and drug and alcohol problems,

20  <u>United States v. Rodriguez-Rodriguez</u>, 364 F.3d 1142, 1146 (9th Cir. 2004), <u>amended on other</u>

21  <u>grounds</u>, 393 F.3d 849 (9th Cir. 2005).  Courts also consider the explicitness of the waiver.  <u>Rodriguez-</u>

22  <u>Rodriguez</u>, 393 F.3d at 855.

23       The court found Detective Moniot's testimony credible that he orally advised Garcia of his

24  *Miranda* rights from memory, while glancing at the federal advisement of rights form marked and

25  admitted as Government's Exhibit "1."  Garcia testified he read the transcript of both voluntary

26  statements which were marked and admitted as Defendant's Exhibits "A" and "C" respectively, and

27  that they were accurate.  On the voluntary statement admitted as Exhibit "A," Garcia answered "yes"

28  when Detective Moniot asked him on tape whether he had received the advice of rights form, waived

1   the rights, signed the form, and agreed to speak with the detective about his side of the story.

2        It is undisputed that Garcia signed the written waiver form.  Detective Moniot testified that after

3   orally advising Garcia of his *Miranda* rights, he gave Garcia the written form, confirmed he could read

4   and write English, and asked him to read it and sign it.  Garcia testified that Moniot did not verbally

5   advise him of his rights, but did hand him the form and asked him to read it.  Garcia was asked on

6   direct examination whether he "read each and every right on the form" before signing it.  He responded

7   that he signed the advice of rights form but did not read it because he was shocked and scared.  He also

8   testified that he recalled thinking he should read the form, and make sure what he was signing.

9        Moniot and Garcia both testified that Moniot told Garcia that he was under arrest, and that

10  Moniot wanted to speak with Garcia and get his side of the story.  Both Garcia and Moniot testified that

11  Moniot told Garcia that if Garcia would agree to remain non-combative and cooperative, Moniot would

12  handcuff him in front rather than in back.  Both Garcia and Moniot testified that Moniot asked Garcia if

13  there were any weapons in his vehicle.  Both Garcia and Moniot testified that Detective Moniot was

14  nonthreatening and friendly or informal.  Both testified that Garcia wanted to talk to Moniot.  Finally,

15  both testified that Moniot did not ask Garcia any questions about the case until after Garcia signed the

16  advice of rights form.  Garcia testified several times on direct and cross examination that he wanted to

17  speak with Detective Moniot, and understood that if he did not sign the form, Detective Moniot would

18  not talk with him.  After Garcia signed the form and verbally confirmed he had waived his rights and

19  wanted to talk, he was interviewed on tape.

20        Detective Moniot had a few followup questions and initiated a second tape recorded interview

21  two minutes after the initial taped interview which lasted approximately nine minutes.  Garcia testified

22  that after the first tape recorded conversation ended, he asked Moniot if he was going to jail, and was

23  told he was.  During the second tape recorded interview, Garcia asked Moniot "Did I waive my right to

24  a lawyer seriously?"  After clarifying what Garcia meant and receiving an audible response on the tape,

25  Moniot immediately terminated the interview and ceased questioning Garcia.

26        When the court inquired of Garcia why he asked the question about waiving his right to an

27  attorney, his immediate response was that he was "relaxed."  He went on to explain that he had heard

28  Moniot say something about "Miranda" or "rights" and it "hit him in the head" like on "Law and

14

1  Order" that "maybe this is it."  It is clear from the testimony, and the court finds, that Garcia was

2  advised of and waived his *Miranda* rights, and wanted to talk with Detective Moniot.  At the time of his

3  arrest, Garcia was twenty-nine years old and had been in the military for nine years where he had

4  received basic military training and leadership training which taught him to deal with stressful

5  circumstances.  He achieved the rank of staff sergeant.  Garcia acknowledged in his testimony that

6  Moniot was friendly and nonthreatening.  Under the totality of the circumstances surrounding this

7  interrogation, the court finds Garcia understood, and waived his *Miranda* rights before he was subjected

8  to custodial interrogation.

9       It is also clear, and the court finds, that after agreeing to speak with Detective Moniot, and after

10  being told he was going to jail, Garcia decided he needed a lawyer, and no longer wanted to talk.

11  Again, it is clear, and the court finds, that once his intention to invoke his rights was articulated and

12  clarified, Detective Moniot "scrupulously honored" Garcia's right to remain silent, terminated the

13  interview, and ceased all questioning.  See, Michigan v. Mosley, 423 U.S. 96, 104 (1975).

14                                                    **CONCLUSION**

15       The general biographical and identification questions Moniot asked Garcia prior to the

16  administration of *Miranda* warnings were not the functional equivalent of interrogation.  Garcia

17  acknowledged that he made statements prior to the administration of *Miranda* warnings that were not in

18  response to any questions Moniot posed.  Garcia's pre-*Miranda* statements are, therefore, admissible.

19  The court also finds Garcia received and waived his *Miranda* rights, and that his waiver was voluntary,

20  knowing, and intelligent.

21       For all of the foregoing reasons,

22       **IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that

23  Garcia's Motion to Suppress (#12) be DENIED.

24       Dated this 4th day of April, 2008.

25

26                                                      _____
                                                        PEGGY A. LEEN

27                                                      UNITED STATES MAGISTRATE JUDGE

28

                                                       15